**In re SKYLER RIDGE, Debtor.**

**Bankruptcy No. LA 87–13216–SB.**

United States Bankruptcy Court, C.D. California.

Dec. 15, 1987.

Leslie A. Cohen of Levene & Eisenberg, Los Angeles, Cal., for debtor.

Lawrence Meyerson of Rosen, Wachtell & Gilbert, Los Angeles, Cal., for secured creditor Travelers Ins. Co.

### FIRST AMENDED MEMORANDUM OF DECISION

SAMUEL L. BUFFORD, Bankruptcy Judge.

## I. INTRODUCTION

Secured creditor Travelers Insurance Company ("Travelers") brings this motion pursuant to Bankruptcy Rule 3012[1] for a determination of the amount of its first priority lien on the debtor's principal asset, a 448–unit apartment complex located in Overland Park, Kansas.

The debtor has proposed a sale of the property for $19,500,000 pursuant to a plan of reorganization, and to pay Travelers in full on its $15,000,000 note secured by a first mortgage on the property. However, Travelers contends that the payoff on its note is approximately $17,000,000. Furthermore, Second Kansas City Apartments Joint Venture ("SKC"), the holder of the second mortgage on the property, is unwilling to vote for the plan unless it receives $4,050,000 from the proceeds of the $19,-500,000 sale of the property.

In addition to accrued interest on the debt, Travelers claims that it is entitled to be paid two sums. First, it claims that it is entitled to the payment of some $2,000,000 pursuant to a prepayment premium clause in the loan agreement. Second, it claims that it is entitled to recover interest after debtor's post-petition default at the contractual default rate of 14.75 percent, instead of the non-default contractual rate of 10.75 percent. This determination is crucial to the issue of how much will be paid to junior lienholders and to administrative claimants in this case, and to whether the plan can be confirmed.

The Court holds that the default interest rate is valid, and that Travelers is entitled to interest at the default rate from the date of default. However, the Court finds that the prepayment premium provision is an invalid liquidated damages clause, and that in consequence Travelers' secured claim does not include this amount.

## II. FACTS

Debtor Skyler Ridge filed its voluntary bankruptcy petition on June 30, 1987 under

---

1. Bankruptcy Rule 3012 provides:
   The court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct.

Chapter 11 of the Bankruptcy Code. Its only substantial asset is a 448–unit apartment complex in Overland Park, Kansas.

SKC developed the apartment complex, and owned it until May, 1986. On April 30, 1986 Travelers lent $15,000,000 to SKC, secured by a first mortgage on the apartment complex. SKC gave Travelers a ten-year promissory note, which provides for the payment of interest only for the first five years, and for the retirement of approximately $250,000 of principal prior to the balloon payment at the end of the tenth year. The note provides for interest at a pre-default rate of 10.75 percent and a default rate of 14.75 percent per annum. The note also provides for a late charge of four percent on any late payment, and for reasonable attorneys fees.[2]

The note contains a provision for extra compensation to Travelers if it is paid early. The prepayment premium provision states in relevant part:

> The privilege is reserved to pre-pay all of the outstanding principle balance, all accrued interest and all other sums due on this Note on any installment payment date ... provided the holder of this Note has been paid a prepayment premium equal to the greater of (a) the product obtained by multiplying (i) the difference obtained by subtracting from ten and 75/100 percent (10.75%) the yield rate of 11⅛s % U.S. Treasury Notes due November, 1995 (as such yield is reported in *The Wall Street Journal* or similar publication on the fifth business day preceding the prepayment date) and (ii) the number of whole and fractional years remaining between the prepayment date and the scheduled maturity date of this Note, and (iii) the prepaid principle amount or

> (b) one percent (1%) of the prepaid principal amount. ...

The parties agree that this clause requires the payment of the prepayment premium unless it is found invalid.

Counsel for Travelers has informed the Court that this provision in the loan agreement is standard contract language for Travelers, and that indeed it may be standard language for the lending industry generally. *Cf. Teachers Insurance & Annuity Association v. Butler*, 626 F.Supp. 1229, 1235 (S.D.N.Y.1986) (finding that such clauses are the custom and practice in the California real estate financing market).

■ The note also contains a prohibition on its prepayment for the first two years ("lock-in"). However, Travelers does not insist on the enforcement of this provision, and it is not enforceable in a bankruptcy case.

One week after closing the loan with Travelers, SKC sold the apartment complex for $19,335,000 to the debtor, who assumed the obligations of SKC under its agreements with Travelers. In addition, SKC took back three notes totaling $5,335,000 [3] secured by a second mortgage.

At the same time the debtor borrowed $1,000,000 from Home Savings & Loan Association ("Home Savings"), secured by a third mortgage on the property, which apparently was used for the down payment to purchase the property. A substantial portion of this debt has been paid, and approximately $225,000 remains outstanding. The Home Savings mortgage was apparently not recorded until less than 90 days before the filing of the bankruptcy case.

Debtor made its mortgage payments to Travelers through July, 1987, including the

---

2. The Court notes that K.S.A. 58–2312 prohibits and invalidates attorneys fees clauses in notes or mortgage documents. The Kansas Supreme Court has stated that this is a strong Kansas public policy. *Young v. Nave*, 135 Kan. 23, 10 P.2d 23, 24 (1932). However, this public policy has apparently eroded somewhat in the years since *Young* was decided: a number of Kansas statutes now permit attorneys fees. *See* Note, "Recovery of Attorneys Fees in Kansas," 18 Wash.L.J. 535 (1979).

3. The original debt to SKC totals $2,000,000 more than the sale price given to the Court. The SKC debt includes a claim for $1,500,000 arising from a letter of credit that SKC obtained for the benefit of Travelers to secure certain rental income promises. If the letter of credit is paid, the debt to Travelers will be reduced *pro tanto;* if not, the debt to SKC will be reduced by this amount. The remaining $500,000 is unexplained.

first post-petition payment. It has not made the subsequent post-petition payments. In consequence, SKC brought a motion for relief from stay, which resulted in a stipulation for relief from stay effective on December 13, 1987.

The debtor has found a buyer for the property. Because of the urgency of completing the sale, the debtor has proposed a liquidation plan of reorganization.

The proposed sale price is $19,500,000 in cash. The debtor's plan, filed on August 28, 1987, proposes to distribute the cash as follows: (1) a payoff of Travelers in the amount of approximately $15,000,000; (2) partial payment to SKC in the amount of $4,050,000; (3) payment in full to Home Savings in the approximate amount of $225,000; (4) $225,000 for administrative claims allowable under Bankruptcy Code § 503, 11 U.S.C. § 503 (1979 & Supp.1987).

Homes Savings, SKC and the debtor have entered into an agreement whereby, if SKC is paid $4,050,000 pursuant to the plan, SKC will permit Home Savings to be paid the $225,000 owing to it, and will permit $225,000 to be paid for administrative expenses. Thus the viability of the proposed plan depends upon the disallowance of the prepayment premium claim by Travelers and perhaps its default interest claim also.

## III. ANALYSIS

The Court notes first of all that the loan agreement here at issue was entered into between sophisticated parties for a large sum of money, who were presumably represented by informed counsel. The default interest provision is not obscure, and was not likely to be overlooked by the parties at the time of contracting. The agreement before the Court does not appear to be a contract of adhesion.

### A. Prepayment Premium

The premium payable pursuant to the formula in part (a) of the prepayment premium clause is computed as follows: (1) the contract rate of interest (10.75%) (2) less the yield rate of 11½s percent U.S. treasury notes due November 1995 (as such yield is reported in The Wall Street Journal on the fifth business day preceding the prepayment date) is (3) multiplied by the number of whole and fractional years remaining between the prepayment date and the scheduled maturity date of the note, which is (4) multiplied by the principal amount to be prepaid. The prepayment premium is the amount calculated pursuant to this formula or one percent of the prepaid principal amount, whichever is larger.

On December 4, 1987 *The Wall Street Journal* reported the yield on November 1995 11½s percent U.S. Treasury notes to be 8.82%. At this rate, the prepayment premium for a payoff on December 11, 1987 would be (10.75–8.82)% x 8–142/366 x $15,000,000, which totals $2,428,319.67.

The classification of the prepayment premium language as a liquidated damages provision is not altogether certain. However, the parties have agreed upon this characterization of the provision, and the Court accepts this characterization. *Cf. Garrett v. Coast & Southern Federal Savings & Loan*, 9 Cal.3d 731, 738, 108 Cal. Rptr. 845, 511 P.2d 1197 (1973). Accordingly, the validity of the provision must be determined in the first instance by the standards applicable to clauses for liquidated damages. A liquidated damages clause that is in reality a penalty cannot be enforced in a bankruptcy court. *In re Tastyeast, Inc.*, 126 F.2d 879, 881 (3d Cir.1942); *cert. denied sub nom. Modern Factors Co. v. Tastyeast, Inc.*, 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942); *Hassett v. Revlon, Inc. (In re O.P.M. Leasing Services)*, 23 B.R. 104, 111 (Bankr.S.D.N.Y.1982).

Unless there is an underlying right to payment under non-bankruptcy law, there is no allowed secured claim under Bankruptcy Code § 506(b), 11 U.S.C. § 506(b) (Supp.1987).[4] A claim is defined in Bankruptcy Code § 101(4), 11 U.S.C. § 101(4)

---

**4.** For attorneys fees only, there is some authority that they are allowable under section 506(b) as part of a secured claim, even if they are invalid under the applicable state law. *See In re American Metals Corp.*, 31 B.R. 229, 235 (Bankr. D.Kan.1983) (dictum), 3 *Collier on Bankruptcy* ¶ 506.05 (15th ed. 1987), at 506–49.

(1979), as a "right to payment" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment". *Cf. Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946); 3 *Collier on Bankruptcy* ¶ 506.05 (15th ed. 1987), at 506–48.

Whether a contractual provision is an unenforceable penalty is determined by applicable state law. *United Merchants & Manufacturers v. Equitable Life Assurance Society (In re United Merchants & Manufacturers),* 674 F.2d 134, 141 (2d Cir. 1982); *O.P.M. Leasing,* 23 B.R. at 111.

### 1. State Law

The note provides that it is to be construed according to the laws of the State of Kansas. Accordingly, the Court turns to Kansas law to determine the validity of the liquidated damages provision under state law.

#### a. Kansas case law

Kansas follows the common law on liquidated damages: liquidated damages are authorized if the amount specified is determined to be reasonable and the amount of damages is difficult to ascertain. *See, e.g., White Lakes Shopping Center, Inc. v. Jefferson Standard Life Insurance Co.,* 208 Kan. 121, 490 P.2d 609, 613 (1971); *Unified School District No. 315 v. DeWerff,* 6 Kan. App.2d 77, 626 P.2d 1206, 1208 (1981). If the requirements for a valid liquidated damages clause are not met, however, the provision is an illegal penalty, and is void. *Unified School District,* 626 P.2d at 1209; *White Lakes,* 490 P.2d at 613. Generally, Kansas law considers a contract provision to be a penalty where there is no attempt to calculate the amount of damages that might result from a breach, *Unified School District,* 626 P.2d at 1209, or where the calculation is not reasonable. *Id.* at 1210. A valid liquidated damages provision cannot be the result of compulsion or an adhesion contract. *Id.* at 1209.

Reasonable prepayment premiums are generally enforceable. *In re LHD Realty Corp.,* 726 F.2d 327, 330 (7th Cir.1984); *see generally* Annotation, *Construction & Effect as to Interest Due of Real Estate Mortgage Clause Authorizing Mortgagor to Prepay Principal Debt,* 86 A.L.R.3d 599 (1978). A prepayment premium is not unusual in commercial loans of this magnitude between sophisticated business entities, each of which seeks its own maximum benefits and protections in the transaction. Neither party has cited, and the Court has not discovered, any Kansas case on prepayment premiums.

Thus the Court must examine whether the language of the agreement in this case satisfies two requirements: (1) the amount of damages is difficult to ascertain; (2) the estimate of damages is reasonable. The debtor does not contest the difficulty of ascertaining damages as of the date of entering into the loan agreement. Thus the Court turns to the question of the reasonableness of the estimate of damages.

#### b. Reasonableness

In determining whether a liquidated damages clause results from a reasonable endeavor to estimate fair compensation for a loss that would be sustained on default, the Court is not entitled to roll the clock forward and see what has actually happened. Instead, the Court is required to evaluate the reasonableness of a liquidated damages provision from the viewpoint of the parties at the time of contracting. *See, e.g., United Merchants & Manufacturers v. Equitable Life Assurance (In re United Merchants & Manufacturers),* 674 F.2d 134, 142 (2d Cir.1982); *Garrett v. Coast & Southern Federal Savings & Loan,* 9 Cal. 3d 731, 738, 108 Cal.Rptr. 845, 511 P.2d 1197 (1973). It makes no difference whether the actual damages are higher or lower than the reasonable estimate. *United Merchants,* 674 F.2d at 142.

The Court must examine the purpose of the prepayment premium provision to ascertain its reasonableness. The usual purpose of a prepayment premium provision in a loan agreement is to assure that the lender will receive the contractual rate of return for the life of the loan, or the equivalent thereof. Such a clause provides

protection to a lender against a downturn in interest rates, which would permit the borrower to refinance the mortgage at a lower interest rate, and thereby deprive the lender of its unearned interest over the unexpired portion of the loan. *See In re LHD Realty Corp.*, 726 F.2d 327, 330 (7th Cir.1984); *Teachers Insurance & Annuity Association v. Butler*, 626 F.Supp. 1229, 1235 (S.D.N.Y.1986). This function is provided, albeit imperfectly, by the first alternative in the prepayment premium provision before the Court.

■ The formula in the promissory note in this case essentially awards Travelers the larger of (1) damages resulting from its lost interest for the remainder of the loan, *or* (2) its transaction costs. If the clause in this case were a reasonable endeavor to estimate fair compensation for these losses upon default, it could be upheld under Kansas law. *Cf. In re Maryvale Community Hospital, Inc.*, 307 F.Supp. 304 (D.Ariz. 1969), *aff'd*, 456 F.2d 410 (9th Cir.1972) (prepayment premium upheld). However, the formula in the promissory note is not reasonably calculated to approximate these damages. The Court finds that the formula is an unreasonable estimate in two respects.

The approximation of Travelers' potential lost interest is calculated by multiplying the amount of the prepayment by the differential in interest rates (contract rate minus reference rate) for the remaining term of the loan. However, instead of the market rate for first mortgages, the reference rate in the contract is the yield for U.S. Treasury notes due November, 1995. The interest rate on U.S. Treasury notes is systematically lower than the interest rate on first mortgages for construction loans on apartment buildings, because the risk is lower. The yield for U.S. Treasury notes runs approximately 1.3 to two percentage points below the market for first mortgages. Thus, a drop of one percent in the long-term mortgage rate would result in almost a triple recovery to Travelers; a drop of two percent would result in almost a double recovery. Even a drop of six percent, to an interest rate of 3.75%, would still result in overcompensation to Travelers by 20 to 30 percent.

It would have been permissible for the parties to have chosen an index rate such as that for U.S. Treasury notes that differs from the market for long-term first mortgages, provided that some appropriate adjustment to bring this rate up to the first mortgage rate were included. However, the parties included no such adjustment in the formula in the promissory note. Thus the Court finds that this feature of the formula in the promissory note is unreasonable.

The second deficiency in the formula in the promissory note is that it contains no discount for present value. Application of the formula would permit Travelers to recover its entire lost interest at the time of prepayment, rather than over the life of the loan. Because there is no recognition of the time value of money in the formula, the Court finds that this feature of the formula is also unreasonable and cannot be upheld. *Cf. Teachers Insurance Annuity Association v. Butler*, 626 F.Supp. 1229, 1236 (S.D.N.Y.1986) (interest discounted to present value).

The formula contained in the note provides that the liquidated damages are the larger of either the amount determined by the formula discussed above or one percent of the prepaid amount, which in this case would be $150,000. In effect, $150,000 is the floor for the prepayment premium (under the payment schedule, there is no significant principal amortization over the life of the loan). Travelers defends this floor on the grounds that its transaction costs in negotiating and executing a loan of this magnitude are approximately $150,000. This floor plays no role in this case, because the formula amount is so much greater.

While upon premature repayment a lender may be entitled to recover the unamortized portion of its transaction costs in relending the funds, the Court notes that the floor provision contains no adjustment to amortize the transaction costs over the life of the loan, and it is unreasonable, also.

Travelers also contends that it could not relend $15,000,000 immediately upon its repayment, and that it would suffer additional lost interest from premature repayment. However, any such lost interest would not be substantial, for several reasons. First, the prepayment penalty provision requires thirty days notice to Travelers, which would give it a substantial amount of time to find a new home for the funds. While thirty days may not be entirely sufficient for this purpose, it would substantially attenuate any lost interest. Second, Travelers would certainly place the funds temporarily in the commercial paper or short term loan market, and thereby reduce any loss to one or two percent per annum for the gap. Thus any lost interest before the funds are placed in a new long-term loan would be limited to approximately $10,000 to $20,000. *Cf. Teachers*, 626 F.Supp. at 1236 (disallowing claim for difference between short-term interest rate and contract rate for a period of six months). If this sum (or a formula to calculate it) had been included in the liquidated damages provision, it may have been upheld under Kansas law (if the provision as a whole were otherwise reasonable), either as a floor or as additional damages.

Travelers relies upon *Teachers* in support of the allowability of its prepayment premium clause. While *Teachers* may support the legitimacy of a properly drawn prepayment premium provision, it cannot rescue the provision in the promissory note before the Court.

*Teachers* involved a borrower that refused to close a loan agreement without justification. Although the loan commitment included no prepayment premium provision, the court found that the lender's damages included damages to which the lender would be entitled under its standard prepayment premium clause. The Court notes three major distinctions between *Teachers* and the case before the Court. First, the damages awarded in *Teachers* were reduced to present value. Second, the prospective borrower did not challenge the reasonableness of the prepayment premium provision in *Teachers*, and the court did not address this issue in that opinion.

Third, *Teachers* involved a borrower that was trying in bad faith to evade its obligation for a take-out mortgage at 14.25%, which was a condition for its construction financing, because interest rates had fallen during the construction.

## 2. Section 506(b)

The debtor also attacks the prepayment premium provision under Bankruptcy Code § 506(b), on the grounds that it is an unreasonable fee. Section 506(b) provides:

> To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b)(1978). Debtor contends that this provision prohibits Travelers from recovering unreasonable liquidated damages under the "reasonable fees" provision, even if such liquidated damages are permitted under state law.

■ Federal bankruptcy law, and not state law, governs distribution of a debtor's assets to creditors. *American Surety Co. v. Sampsell*, 327 U.S. 269, 272, 66 S.Ct. 571, 573, 90 L.Ed. 663 (1946); *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 162–63, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946). Thus debtor correctly claims that section 506(b) is applicable, and limits Travelers to the collection of reasonable charges. If the prepayment premium provision were valid under Kansas law, the Court would be required to determine its enforceability under the Bankruptcy Code.

Section 506(b) imposes two requirements for the collection of an additional charge by an oversecured creditor: (1) the charge must be provided for in the agreement, and (2) the charge must be reasonable. *See, e.g., Joseph F. Sanson Investment Co. v. 268 Limited (In re 268 Limited)*, 789 F.2d 674, 676–78 (9th Cir.1986). Debtor challenges the prepayment premium under the second of these standards.

Section 506(b) may in fact be more permissive than the common law on liquidated damages. Under the common law, a liquidated damages provision that is unreasonable is condemned as a penalty and is totally unenforceable. *See supra; In re American Metals Corp.*, 31 B.R. 229, 237 (Bankr.D.Kan.1983). In contrast, the Court under section 506(b) may be permitted to award reasonable fees even where the amount sought is unreasonable. *See 268 Limited*, 789 F.2d at 675–78.

Travelers relies upon *United Merchants & Manufacturers, Inc. v. Equitable Life Assurance Society (In re United Merchants & Manufacturers)*, 674 F.2d 134 (2nd Cir.1982), where the circuit court reversed the bankruptcy court's disallowance of a prepayment premium under a provision rather similar to that before this Court in a Bankruptcy Act case. While *United Merchants* prohibits the Court from holding that a liquidated damages provision is unenforceable as a matter of bankruptcy law, it does not determine the case before the Court. The bankruptcy court in *United Merchants* had invalidated the prepayment premium provision under New York law. The Second Circuit found that the bankruptcy court had incorrectly applied New York law, and that New York law permitted the enforcement of such a provision. The court further found that, so long as the provision is valid under state law, there was no warrant in the Bankruptcy Act for rejecting it merely because it is triggered by the filing of a bankruptcy case. *Id.* at 143–44. If the provision is unreasonable, however, Bankruptcy Code § 506(b) prohibits its application.

■ The Court finds that the liquidated damages sought by Travelers are unreasonable under section 506(b), for the same reasons that they are unreasonable under Kansas law. However, because the common law on liquidated damages requires the entire disallowance of the fees sought on the grounds that they are a penalty, the Court does not reach the issue of whether or to what extent a reasonable liquidated damages award may be allowable under section 506(b).

### 3. Acceleration of Debt

Debtor also argues that the filing of the bankruptcy petition accelerated the Travelers debt, and thereby eliminated any prepetition right to a prepayment premium. In support of this argument debtor cites *In re Manville Forest Products Corp.*, 43 B.R. 293, 297–98 (Bankr.S.D.N.Y.1984) (acceleration of debt), and *In re LHD Realty Corp.*, 726 F.2d 327, 330–31 (7th Cir.1984) (no prepayment premium upon acceleration).

■ Debtor's argument is flawed. The automatic acceleration of a debt upon the filing of a bankruptcy case is not the kind of acceleration that eliminates the right to a prepayment premium.

The automatic acceleration of a debt upon the filing of a bankruptcy case is well established. *See, e.g., Manville Forest Products*, 43 B.R. at 297; H.R. No. 95–595, 95th Cong., 1st Sess. 353 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6309; Sen.Rep. No. 95–989, 95th Cong., 2d Sess. 63 (1978), *reprinted in* U.S.Code Cong. & Admin.News 5787, 5849. In fact, it is this automatic acceleration that prevents Travelers from enforcing its "lock-in" clause.

This acceleration is subject to deceleration in a plan under Chapter 11 or Chapter 13 of the Bankruptcy Code. *See, e.g., Manville Forest Products*, 43 B.R. at 298 (Chapter 11); *Di Pierro v. Taddeo (In re Taddeo)*, 685 F.2d 24, 26–29 (2d Cir.1982) (Chapter 13).

If automatic acceleration of a debt defeats a prepayment premium clause, such a clause could never be enforced in a bankruptcy case. A debtor, under such a rule, could always avoid the effect of a prepayment premium clause by filing a bankruptcy case. Neither the Bankruptcy Code nor case law compels so drastic a result. No bankruptcy policy compels the invalidation of a properly drawn prepayment premium clause in all cases.

*LHD Realty* is consistent with this view. The court in *LHD Realty* held that the elimination of the prepayment penalty re-

sulted only from the creditor's voluntary acceleration of the debt, and not from the automatic acceleration resulting from the bankruptcy filing. The court found that the creditor's filing of a motion for relief from stay to foreclose was a voluntary acceleration of the debt by the creditor. *Id.*, 726 F.2d at 331.

In contrast, Travelers has not initiated any foreclosure action or a motion for relief from stay in this case. The relief from stay motion was brought by SKC, the second mortgage holder. Travelers has only demanded payment according to the terms of its note at the time of sale of the property.

### 4. Unearned Interest

Debtor also contends that the prepayment premium should be disallowed because it represents unearned, unmatured interest. Bankruptcy Code § 502(b) provides:

> [I]f ... objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim ... as of the date of the filing of the petition, and shall allow such claim in such amount except to the extent that—
>
> .    .    .    .    .
>
> (2) such claim is for unmatured interest....

11 U.S.C. § 502(b) (Supp.1987).

■ The foregoing provision prohibits Travelers from collecting interest maturing after its loan is paid in full. However, the Court does not interpret the foregoing statutory provision to apply to a liquidated damages provision, even where the damages are for unearned interest. Liquidated damages, including prepayment premiums, fully mature at the time of breach, and do not represent unmatured interest. *In re 360 Inns, Ltd.*, 76 B.R. 573, 576 (Bankr.N. D.Tex.1987).

As a policy matter, the Court considers it proper for a lender to enter into a loan agreement that protects it from loss of interest through premature repayment of a loan. Otherwise, a lender that has priced a loan based upon the expectation of a long-

term commitment to the contractual interest rate can be frustrated by a refinancing after the filing of a bankruptcy case at a time of lower interest rates. If secured lenders and borrowers want to contract to protect a secured lender's interest rate through the payment of reasonably calculated liquidated damages, there is no bankruptcy policy to prohibit the enforcement of such a provision.

Junior lenders such as SKC are subject to such provisions in more senior encumbrances. It would be particularly appropriate in this case to impose such a burden on SKC, because SKC was the borrower from Travelers that agreed to the liquidated damages provision, immediately before it sold the property to the debtor. However, SKC escapes such a burden in this case because the liquidated damages sought by Travelers are not reasonably calculated.

### 5. Redemption Premium

Debtor further objects to the prepayment premium on the grounds that it is a redemption premium that is prohibited by Bankruptcy Code § 1124(3)(A). Section 1124 provides:

> [A] class of claims is impaired under a plan unless ... the plan—
>
> .    .    .    .    .
>
> (3) provides that, on the effective date of the plan, the holder of such claim ... receives ... cash equal to—
>
> (A) With respect to a claim, the allowed amount of such claim....

11 U.S.C. § 1124(3)(A) (Supp.1987).

The text of section 1124(3)(A) makes no reference to a redemption premium. Such a reference is contained only in the legislative history. The House Report is silent on a redemption premium, and only the Senate Report makes reference to it:

> [A] claim or interest is unimpaired if the plan provides for their payment in cash. In the case of a debt liability, the cash payment is for the allowed amount of the claim, *which does not include a redemption premium.*

Senate Report 95–989, 95th Cong., 2d Sess. 120 (1978), *reprinted in* 1978 U.S.Code

Cong. & Admin.News 5787, 5906 (emphasis added).

■ The Court notes that the purpose of section 1124 is to define impairment for voting and other purposes in the Chapter 11 confirmation process, and not the extent of a secured claim. However, it appears that the allowed amount of a secured claim should include any allowable prepayment premium.

The Court is more troubled by the fact that the language relied upon by debtor is contained only in the legislative history, and it is thus not part of the statute. Furthermore, the statement does not appear in the legislative history of a provision relating to the allowance of claims, but only in the legislative history relating to a provision that defines impairment with respect to a plan. In addition, the language appears only in one of the legislative reports: while for many Bankruptcy Code provisions the House Report and the Senate Report are virtually identical, the reports are quite different for section 1124. Counsel has cited no case, and the Court has discovered none, applying this language.

For these reasons the Court declines to rest its disallowance of the prepayment premium on the grounds that it is a redemption premium disallowed by section 1124.

## 6. Subordination

The debtor further argues that the prepayment premium provision constitutes a penalty that must be subordinated pursuant to Bankruptcy Code § 726(a)(4), which provides for the subordination of,

> any allowed claim, whether secured or unsecured, for any fine, penalty, or forfeiture ... to the extent that such fine, penalty, or forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim.

The subordination of claims for penalties applies only to penalties that are valid under state law, and thus are allowable claims. Because the Court finds that the provision for a prepayment premium is invalid under Kansas law, no subordination is required.

## B. Default Interest Rate

■ In addition to attacking the prepayment premium provision, debtor contends that the default rate of interest cannot be charged by Travelers. The Court overrules this objection, and finds that Travelers may charge the default rate in this case from the date of post-petition breach.

The statutory provision governing default interest is section 506(b), which simply provides that an over-secured creditor is entitled to "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." Neither the Bankruptcy Code nor its legislative history makes any reference to the legitimacy of a default rate of interest.

The Court first notes an interpretive question arising from the placement of a comma after the phrase "interest on such claim": the language may be read so that this phrase is not modified by the phrase "provided for under the agreement under which such claim arose." The most persuasive analysis of this language is in *In re Loveridge Machine & Tool Co.*, 36 B.R. 159, 162 (Bankr.D.Utah 1983), where the court explained that the phrase "provided for under the agreement ..." should not modify the interest provision, because several types of security interests do not arise under agreement (*e.g.*, judgment liens, mechanics liens and tax liens). The court reasoned that section 506(b) requires interest on non-contractual security interests, as well as on security interests arising under contract.

However, the court in *Loveridge Machine* further held that, where there is a contract rate, that rate must be applied by the court. *Id.* at 163–65. Ninth Circuit law is in accord where interest is provided by contract. *Joseph F. Sanson Investment Co. v. 268 Limited (In re 268 Limited)*, 789 F.2d 674, 676 (9th Cir.1986); *Bank of Honolulu v. Anderson (In re Anderson)*, 69 B.R. 105, 108 (9th Cir. BAP 1986).

The Court notes that Travelers does not claim entitlement to the default rate of

interest in consequence of the filing of this bankruptcy case. In fact, the first post-petition payment was made timely, at the non-default interest rate. However, the debtor thereafter has only made partial payments, and these payments have been late.[5] In consequence, Travelers claims that it is entitled to charge at the higher default interest rate of 14.75 percent per annum from the date of default.

The touchstone for all decisions determining the allowance of interest in bankruptcy reorganization is a balance of equities between creditor and creditor or between creditors and debtor. The leading case is *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), which arose under the Bankruptcy Act. In *Vanston* the issue was whether the insolvent debtor was required to pay interest on unpaid interest to first mortgage bondholders after the court had suspended the interest payments, where the bond indenture provided for such payment and where the debtor's assets were sufficient to pay the first mortgage bondholders in full including the interest on interest. The Supreme Court recognized that, if interest on interest were paid to the first mortgage bondholders, the distribution to lower priority creditors, including unsecured creditors, would be measurably reduced. The Supreme Court disallowed the payment of interest on interest, stating that bankruptcy courts must balance the equities between creditor and creditor, or between creditors and the debtor. *Id.*, 329 U.S. at 165, 67 S.Ct. at 241. *Cf. Debentureholders Protective Committee v. Continental Investment Corp.*, 679 F.2d 264, 269 (1st Cir.1982), *cert. denied*, 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982) (interest on interest allowed where debtor is solvent).

This equitable balancing led to the rule under the Bankruptcy Act that secured creditors should be allowed interest where the value of the security exceeded the debt plus the accrued interest. *See, e.g., Palo Alto Mutual Savings & Loan v. Williams*, 245 F.2d 77, 78 (9th Cir.1957) (dictum).

This included interest at a higher default rate, if the contract so provided and the debtor was solvent. *Ruskin v. Griffiths*, 269 F.2d 827, 830–32 (2d Cir.1959), *cert. denied*, 361 U.S. 947, 80 S.Ct. 402, 403, 4 L.Ed.2d 381 (1960).

This approach under the Act was codified in section 506(b). However, this does not resolve the issue of the legitimacy of a default rate of interest in the present case, where the debtor is insolvent, and the proceeds of sale are not even sufficient to pay junior lienholders.

Debtor relies on *In re W.S. Sheppley & Co.*, 62 B.R. 271 (Bankr.N.D.Iowa 1986), which denied the recovery of default interest. In *Sheppley* the over-secured creditor claimed a default rate of interest of 12 percent in place of the pre-default rate of 9.27 percent. The bankruptcy court found that the default rate of interest was inappropriate, based upon the following factors: (1) there was never any realistic risk of non-payment either before or during the bankruptcy case; (2) there was no evidence that the 9.27 percent contract rate was not the prevailing market rate of interest at the time of default; (3) there was no increased risk to the lender following default, because the plan proposed a quick and orderly liquidation and payment in full to the secured creditor; (4) it did not appear likely that equity interests would receive any distribution under the plan; (5) the lender was partially responsible for the delay of some two years in plan confirmation. *Id.* at 278–79. Debtor argues that the first four factors apply in this case, and ignores the fifth factor.

While the Court concurs that all but the last of the factors applied in *Sheppley* exist in this case, the Court declines to follow the *Sheppley* reasoning. The court in *Sheppley* was careful to adopt a very narrow holding. It determined only that a court is not *required* to apply a contractual default rate of interest in determining the amount of a secured claim under section 506(b). *Id.* at 278. The court placed particular emphasis on the need for flexibility in

---

**5.** No party has offered an explanation to the Court as to why the debtor was able to maintain the payments on the first mortgage through the date of filing and the first post-petition payment, but not thereafter.

deciding whether to apply the default interest rate. *Id.; cf. In re Maryvale Community Hospital, Inc.*, 307 F.Supp. 304, 310 (D.Ariz.1969), *aff'd,* 456 F.2d 410 (9th Cir. 1972) (prepayment premium allowed under Chapter X of Bankruptcy Act, where payment recipients were only creditors of estate). Under *Sheppley* the chargeability of a default rate of interest turns on the equities of the particular case.

Like a prepayment premium, a default interest rate provision may be analyzed as a kind of liquidated damages. *Cf. In re Tastyeast, Inc.*, 126 F.2d 879 (3d Cir.1942), *cert. denied sub nom. Modern Factors, Co. v. Tastyeast, Inc.*, 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942), where the court invalidated a post-maturity interest rate increase as an unreasonable liquidated damages provision. Such an analysis is implicit in the *Sheppley* reasoning.

This Court finds unpersuasive the analysis of the default interest provision before the Court as a type of liquidated damages. The increased interest rate was negotiated by the parties, and falls well within the range of interest rates that the Court has seen frequently in recent years. An interest rate falling outside this range, on the other hand, may be a liquidated damages provision that must meet the standards for valid liquidated damages. *Cf. Tastyeast,* 126 F.2d at 881–82.

A contractual provision that specifies a change in interest rate on default illustrates a broader principle, that contracting parties have the power to contract for interest rates that may vary based on a variety of factors. Some contracts provide for a specified change in the interest rate annually or at other specified intervals. Other contracts tie the interest rate to an index, such as the prime interest rate or a floating average treasury bill rate. Yet other contracts provide a below-market "teaser" rate, which increases after a period of time based on specified conditions.

A default interest rate, like other interest rates in a contract, should be the subject of negotiation at the time that a contract is negotiated. The inclusion of a default interest rate indicates that the parties have given their assent to this provision.

This Court finds no authorization in section 506(b) to examine the reasonableness of the interest rate charged by the secured creditor. Section 506(b) contemplates the award of interest to an over-secured creditor at the contract rate, whatever that contract rate may be. Unlike the provision for fees, costs and charges in section 506(b), this section provides no federal law authorization to modify the contract rate of interest, whether the estate is solvent or insolvent. *Bank of Honolulu v. Anderson (In re Anderson),* 69 Bankr. 105, 108 (9th Cir. BAP 1986); 3 *Collier on Bankruptcy* ¶ 506.05, at 506–43 to 506–47, and cases cited therein.

Section 506(b) also provides no federal inhibition on a contract that varies the interest rate based upon market conditions, default, or other factors. Any restriction on the contract rate of interest must thus come from state law, and not from bankruptcy law. Kansas law places no restriction on the chargeability of a higher rate of interest after default on a promissory note.

Furthermore, the holding of *Vanston* does not apply to the case before the Court, because *Vanston* involved interest payments that were postponed pursuant to court order. In contrast, in this case it appears that the post-petition interest payments were not made (after the first payment) solely because the debtor lacked the funds. It thus appears that the filing of this bankruptcy case is not responsible for the default to Travelers.

Neither bankruptcy law nor non-bankruptcy federal or state law requires or permits the Court to set aside the agreement on interest that the parties have made.

Debtor has not attacked the default interest rate on the grounds of unconscionability or of usury, and the Court does not reach these issues. Apart from usury and unconscionability, the Court has no power to determine the reasonableness of a default interest rate.

## IV. CONCLUSION

For the foregoing reasons the Court finds that the prepayment penalty provision is unenforceable under Kansas law, because it is not a reasonable estimate of

the damages that would result from premature prepayment to Travelers of the loan balance.

The Court recognizes that the principal practical effect of its disallowance of the prepayment premium is to increase the recovery by the second mortgagee. There is a collateral benefit of some importance, however. The second mortgagee has agreed with the third mortgagee to allow the third mortgagee to be paid in full under the plan. In addition, the second mortgagee has agreed to permit $225,000 of the proceeds of the sale of the property to be used to pay administrative claims. Thus the disallowance of the prepayment premium will benefit a number of creditors in this case (albeit not all of them). The Court has the equitable power to avoid the enrichment of certain creditors at the expense of subordinate creditors, where such a result would be unfair. *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 165, 67 S.Ct. 237, 241, 91 L.Ed. 162 (1946).

In contrast, the Court finds that Travelers is entitled to enforce its default interest rate, and to collect interest at the higher default rate from August 1, 1987 to the date of payment.