**INVEX HOLDINGS, N.V., Appellant,**

v.

**EQUITABLE LIFE INSURANCE,**
**Appellee.**

**No. 3:93cv295 AS.**

United States District Court,
N.D. Indiana,
South Bend Division.

Aug. 24, 1993.

Jeffrey E. Kehl, Dowd and Dowd Ltd., Chicago, IL, for Invex Holdings, N.V.

Michael B. Watkins, Barnes and Thornburg, South Bend, IN, for Equitable Life Ins. Co. of Iowa.

### MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

#### A. JURISDICTION

The district court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a), which confers jurisdiction on district courts to hear appeals from final judgments, orders, and decrees of the bankruptcy court. On

March 31, 1993, the bankruptcy court entered a Final Judgment and Order ("Order"), 169 B.R. 182, in which it resolved all issues raised by the parties to the adversary proceeding in favor of the Appellee, Equitable Life Insurance Company of Iowa.

THEREFORE, pursuant to 28 U.S.C. § 158(a), this court has jurisdiction to hear this appeal from the bankruptcy court's judgment. Hearing and oral argument were had in South Bend, Indiana, on July 15, 1993.

## B. FACTS

Invex Finance B.V. ("Invex"), filed an involuntary Chapter 11 proceeding against the debtor, Terry Limited Partnership ("Debtor"), on April 27, 1990. Debtor consented to the proceeding, and an order was entered on June 12, 1990.

Debtor purchased the Society Bank Building in South Bend, Indiana, in December 1983, from Invex Finance, granting the seller a wraparound mortgage which was subordinate to and encompassed by a first mortgage held by Roosevelt Savings Bank ("Roosevelt"), a second mortgage held by Equitable Life Insurance Company of Iowa ("Equitable") and a wraparound mortgage held by Invex Holdings, N.V. ("Invex Holdings").[1] The court found that the value of the Society Bank Building, Debtor's major asset, was $5,350,000. Thus, both Roosevelt and Equitable had oversecured claims. Roosevelt, Equitable, and Invex are the primary creditors in this proceeding. The Indiana Department of Revenue has filed a proof of claim for less than $500; Invex is the only other party to file a proof of claim.

Equitable's claim arises from a June 1, 1984, promissory note in the principal amount of $2,100,000, secured by a mortgage on the Society Bank Building in Equitable's favor. Debtor was to pay interest on the debt at the rate of 14¼% per annum. The rate of default was set at 17¼%. Initially, the note was payable on February 1, 1990, but then extended to April 1, 1990. The Debtor defaulted on April 1, 1990, by failing to pay the principal balance and deferred interest.

Debtor's promissory note to Invex Holdings provided for an interest rate of 17.25% per annum and matured in December 1987. Debtor's wraparound note to Invex Finance provided for interest at the rate of 17.5% per annum and also matured in December 1987. Debtor defaulted on both of these notes.

Debtor filed a proposed plan of reorganization; Invex, having submitted its own plan objected. Subsequently, Equitable and the Debtor reached an agreement ("Stipulated Agreement"), which was approved on June 10, 1992. Invex did not object to this agreement.

Under the terms of the Stipulated Agreement, if Debtor failed to comply with any one of the four conditions contained in the agreement, it would be considered in default. The agreement also provided that in the case of default, Equitable, after notifying the court, would be entitled to have the automatic stay lifted and the building abandoned from the estate, or to have the building sold under 11 U.S.C. § 363. Equitable's claim would consist of the outstanding principal balance, unpaid deferred interest accrued to the date of maturity, and interest accruing at the default rate after maturity, plus attorney's fees and costs. Equitable agreed to waive a prepayment due under the original terms with Debtor, thereby reducing its claim by $700,000.

Following Debtor's default, Equitable filed a motion to have the building sold. Invex filed an emergency motion to have the court modify the Stipulation Agreement to extend the Debtor's time for performance, which was denied. The building was sold pursuant to the court's order, and the auction sale totalled $4,005,001. Roosevelt's claim was paid from the proceeds. Equitable's claim was paid at the contract rate of interest. The excess proceeds of $170,800 were escrowed with the Debtor. This sum represents the difference between interest accrued

---

1. Invex Finance is a wholly-owned subsidiary of Invex Holdings. Lake County Trust Company, acting as trustee, bought the Society Bank Building. Invex Holdings, the beneficiary of the trust, sold its interest to Invex Finance, who in turn sold its interest to Debtor. Invex Finance realized a profit of $774,000 on this resale.

from the date of maturity to sale of the building on Equitable's outstanding balance calculated at the contract rate of 14¼% per annum and calculated at the default rate of 17¼% per annum. The Debtor makes no claim to the excess funds.

## C. ISSUES PRESENTED

Invex has appealed the bankruptcy court's order, arguing that Equitable is not entitled to the default rate of interest on its claim. More specifically, Invex presents several subarguments, each of which is addressed separately by this court.

## D. THE STANDARD OF REVIEW

■ The standard of review this court must follow when reviewing factual findings of the bankruptcy court is set forth in Bankruptcy Rule 8013 which provides:

On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

Fed.R.Bk.P. 8013 (1991). While findings of fact are reviewed under the "clearly erroneous" standard, the bankruptcy court's conclusions of law must be reviewed *de novo.* *Woodbridge Place Apartments v. Washington Square Capital,* 965 F.2d 1429, 1435 (7th Cir.1992); *Oneida Tribe of Indians v. State of Wisconsin,* 951 F.2d 757, 760 (7th Cir. 1991); *Calder v. Camp Grove State Bank,* 892 F.2d 629, 631 (7th Cir.1990).

This standard notwithstanding, the court notes that when so-called referees in bankruptcy were first authorized they were selected directly by United States District Court Judges, often in the nature of political patronage. It is quite true that in service most of these referees developed considerable expertise in the intricacies of bankruptcy law. More than a decade ago, the system of selecting bankruptcy judges changed radically. They are no longer selected by district judges or district courts; they are selected after an elaborate screening process by circuit judicial councils. Uniformly, a preexisting expertise in bankruptcy law is required. Each of the bankruptcy judges now serving in this district came to their task with very substantial preexisting knowledge of bankruptcy law. In this context, the standard for review of bankruptcy judges has both a conceptual and a pragmatic aspect. It is the bankruptcy judges who see and hear the witnesses and must make basic decisions as to weight and credibility. The review process does not generally envision a trial *de novo* with regard to reviewable decisions by the bankruptcy court. Necessarily a bankruptcy litigant who attempts to overturn a reviewable bankruptcy decision sustains a substantial and heavy burden to demonstrate legal error. It is not for a reviewing district court to simply rewrite a bankruptcy decision on purely equitable grounds. Much of the argument that is made here is of that nature and is requesting this court to recast the bankruptcy court's decision on equitable grounds. Put simply, but not disrespectfully, there is a failure to demonstrate the necessary legal basis for this court to disturb the decision of the bankruptcy judge. This court is not in any way here compelled to do so and therefore respectfully denies that request.

## E. DISCUSSION

Invex argues that Equitable is not entitled to a default rate of 17¼%. The appellant claims that the bankruptcy court erred on four distinct issues, each of which this court will address separately. The parties do not dispute that Equitable is entitled to receive interest. As an oversecured creditor, Equitable is entitled to interest under 11 U.S.C. § 506(b):

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

The parties here are disputing whether the default rate of interest should apply to Equitable's claim. The bankruptcy order reflects that the parties agree that courts consider the equities of the case before applying or denying a default rate; thus, no rigid analysis applies here:

Equitable states "(C)ourts applying Code section 506 consistently and uniformly hold that an oversecured creditor is entitled to claim and receive interest at the higher default rate specified in the agreement from which the claim arose unless the equities dictate application of the lesser contract rate." [Equitable's memorandum filed January 20, 1993, at 7.]

Invex states "(A) bankruptcy court has the equitable power to modify a contract provision that calls for the assessment of a higher interest on the oversecured creditor's claim when the award of the higher rate would adversely impact the distribution of a bankruptcy estate's assets to other creditors." [Invex's memorandum filed January 21, 1993, at 5.]

*In the Matter of Terry Limited Partnership,* 169 B.R. 182, 184 (Bkrtcy.N.D.Ind.1993). The bankruptcy court outlines its standard of analysis:

When deciding whether equity requires that a contractual default rate should not be utilized, there is no hard and fast rule or standard test to apply which governs the decision. In each case the court must look to all of the circumstances existing in that particular case. *Matter of Laymon,* 958 F.2d 72 (5th Cir.1992); *In re Hollstrom,* 133 B.R. 535, 539 (Bankr.D.Colo. 1991) (acknowledging that under certain circumstances equity warrants deviating from the contractual default interest rate, but noting that "there is no clear, emerging, definite enumeration of these special circumstances or equitable considerations").

169 B.R. at 185.

■ However, Invex, while acknowledging and even arguing that a broad equity analysis applies in this case, has asserted that the bankruptcy court has erred based on specific elements of analysis. First, Invex claims the reasonableness of a default rate is to be determined by whether it is reasonable at the time of default, not at the time the loan was made. Thus, asserts Invex, "[b]y turning its attention to the date of the original loan transaction, instead of the current market, the bankruptcy court misapplied the law, and as such, should be reversed" (Appellant's Brief at 11). Invex itself, however, correctly states that "[s]ince the adoption of the Bankruptcy Code and the *Ron Pair* decision, lower courts have followed the pre-Code rule of determine post-petition interest on the basis of the equities of the case, again recognizing that bankruptcy necessarily alters the contractual rights of all parties" (Appellant's Brief at 9). In this case, the bankruptcy court's order does address the reasonableness of the default rate at the time the loan was made, but that is only one prong of its analysis of "the equities of the case." The bankruptcy court also looked at the "customary range" of the current lending market, and Invex's own witness testified that "default rates are generally 2½ to 4½ percent over the contract rate" (Order at 185). This court concludes that the bankruptcy court did not err in considering all factors of the default rate. *See Matter of Laymon,* 958 F.2d 72 (5th Cir.1992).

Invex next argues that the evidence established that Equitable's default rate was excessive at the time of default, and that the bankruptcy judge erred by finding the rate reasonable:

Had it properly looked at the current rates of interest obtainable for a mortgage such as Equitable's, the bankruptcy court would have been faced with the uncontradicted evidence that in the secondary market, 17¼% is simply excessive and unreasonable. (TR pp. 17–18). To be sure, Donald Schefmeyer, the only expert witness to testify, stated that a reasonable contract rate for a mortgagee holding Equitable's position would be 9¾% to 10% and that a reasonable default rate would be 12¾% to 13%.

(Appellant's Brief at 11). This argument is ironic as well as brazen, given that Equitable's *default* rate equals Invex's *contract* rate and is *lower* than Invex Finance's *contract* rate (all promissory notes having been issued approximately six months of each other). In

essence, Invex argues that this court must find that Equitable's default rate is excessive, so Invex can recover on the same percentage rate for its contract rate. This court agrees with Equitable and Judge Rodibaugh that the critical factor of the analysis is the reasonableness of the differential between default rates and non-default rates. The testimony of Invex's expert regarding the differential, as well as the cited case law, support Judge Rodibaugh's conclusion that the default rate was not excessive. *In re Schaumburg Hotel Owner Ltd. Partnership*, 97 B.R. 943, 951 (Bankr.N.D.Ill.1989); *In re White*, 88 B.R. 494, 498 (Bankr.D.Mass.1988); *In re Skyler Ridge*, 80 B.R. 500, 511 (Bankr. C.D.Cal.1987).

 Invex argues alternately that, since Equitable faced no realistic risk of nonpayment of the full amount of its claim, the bankruptcy judge erred in finding the default rate reasonable. Both in the bankruptcy court and here on appeal, the appellant bases its argument on *In re W.S. Sheppley & Co.*, 62 B.R. 271 (Bankr.N.D. Iowa 1986). Invex argues that here, as in *Sheppley:*

> Equitable had a substantial equity cushion to be exhausted before it ever faced the risk of nonpayment. Accordingly, the award of default rate interest by the bankruptcy court gave Equitable a windfall profit for being second in line, all to the detriment of other creditors, including Invex. On that basis, the bankruptcy court erred and should be reversed.

(Appellant's Brief at 12–13). This court agrees with the bankruptcy court that *Sheppley* does not stand for the proposition that unless a party can show that it faced a risk of nonpayment, it cannot recover at the default rate. Again, as the bankruptcy court stated: "When deciding whether equity requires that a contractual default rate should not be utilized, there is no hard and fast rule or standard test to apply which governs the decision" (Order at 185). The parties do not dispute that a reasonable default rate should only be denied in order to assist other creditors who would otherwise be affected. Invex has advanced that this court should not grant the default rate so as to benefit other creditors. However, this court notes that the only

creditor who would benefit from such an equitable ruling is Invex. In balancing the equities in this case, it is important to consider that Invex was aware of Equitable's interest at the time it entered into an agreement with Debtor. Also again, this court is being asked to deny Equitable's default rate so that Invex can recover on its junior claim at the same rate. This court agrees with the bankruptcy court's position:

> The court may diminish one creditor's bargained for rights in order to protect a second creditor's bargained for rights. There is nothing equitable, however, in diminishing one creditor's bargained for rights in order to augment the rights bargained for by a second creditor.

169 B.R. at 186. This court finds that equity does not demand that this court deny this bargained for right.

Invex argues that the bankruptcy's finding that the default rate of interest did not overcompensate Equitable for post-petition matters was clearly erroneous. Invex argues that without evidence that Equitable needed the default rate to cover costs, fees and charges that had not been paid, "the bankruptcy court could only find that the award of default rate interest would overcompensate Equitable" (Appellant's Brief at 13). Judge Rodibaugh analyzed the default rate as to its purpose:

> The standard practice of charging a higher interest rate after default is designed as an incentive to the debtor to make timely payments. However, its second purpose is to compensate the lender for any loss resulting from the default such as increased expenses administering the loan and delayed use of the money. The lender's loss on any given defaulted loan will rarely be exactly the additional amount received by charging interest at the default rate. Sometimes the loss will be greater, and sometimes less. A lender cannot know at the time it extends a loan the exact amount of loss it will suffer in the event of a default. Instead, the lender relies on a default interest rate which it has determined is a reasonable approximation of its potential loss. When the differential between the contract and default rates is not

excessive and falls within the usual and customary range, it is legitimately related to the purpose for which it was designed and should not be construed as a burdensome or unconscionable penalty. *E.g., In re Schaumburg Hotel Owner Ltd. Partnership,* 97 B.R. 943, 951 (Bankr.N.D.Ill.1989); *In re White,* 88 B.R. 494, 498 (Bankr. D.Mass.1988); *In re Skyler Ridge,* 80 B.R. 500, 511 (Bankr.C.D.Cal.1987).

169 B.R. at 185. This court does not agree with Invex that a court could not find a default rate reasonable unless the claimant could present a laundry list of expenses. The terms of the loan agreement between Debtor and Equitable were bargained for, as were the terms between Debtor and Invex, who would assert that its own rate in excess of 17% is reasonable as agreed to by the parties. This court does not find that Equitable has been overcompensated by the conclusions reached by Judge Rodibaugh; as the order stands, Equitable has compromised its claim by $700,000.

Invex has also argued that it cannot be bound by the terms of the Stipulated Agreement, as it was not a party to this agreement. Invex claims that the bankruptcy court judge erred in considering the agreement in its determination that the default rate was reasonable. As both the bankruptcy court and this Judge have noted, this appeal rests on equity principles. The bankruptcy judge considered the Stipulated Agreement in light of his equitable balancing, and found Invex's conduct less than persuasive. He noted that Invex neither objected to this agreement, nor did it avail itself of its opportunities for appeal. The terms of the Stipulated Agreement provide that Equitable would compromise its claim and not object to Debtor's proposed plan of reorganization if financing were obtained within a specified time frame. The parties agreed that should Debtor fail to meet this time frame, Equitable would be entitled to its full claim, and that the interest rate would be calculated at the default rate. Invex has argued that it the bankruptcy judge erred, "granting greater rights into the Stipulation than actually existed . . ." (Appellant's Reply Brief at 9). Invex argues that it cannot be bound by the Stipulated Agreement because it is not a party, but its actions constitute a recognition of the agreement. Instead of objecting to the Stipulated Agreement or the court's approval at the appropriate time, Invex attempted to alter the terms to extend Debtor's time for compliance. In essence, Equitable is now bound by terms that grant it less than the original agreement, despite Invex's argument that it is granted more. Since equitable principles govern here, this court is hard pressed to find any basis for denying Equitable its bargained for rights so that Invex can undo its former failure to act. Invex's argument has separated each issue claiming each is reversible error. This court takes the position that all issues were considered in the totality of the circumstances, and the bankruptcy order does not stand and fall as a whole based on the enforceability of the Stipulated Agreement. This court also, in considering each of the factors in light of the whole, does not find the bankruptcy judge's consideration of this agreement reversible order. Absent unconscionability or punitive nature of the terms, the terms agreed to between Debtor and Equitable, as the holder of the senior lien, should not be set aside. Invex was aware of the percentage rates of Equitable's loan at the time it formed its own agreement with Debtor. Invex cannot now argue that its junior lien should prevail over Equitable's senior claim. As Judge Rodibaugh pointed out, the Stipulated Agreement constitutes Equitable's second bargain for its default rate (Order at 186). At the time of the formation of this agreement, Invex could have objected, allowing Equitable to withdraw from less favorable terms. Even these circumstances would not have vitiated Equitable's original claim; as the facts stand now, Invex has failed to show that it is entitled to equitable relief, nor has it shown that the Stipulated Agreement changed its situation from the one Invex bargained for its rights in. Further, this court notes that Invex Finance realized a profit of $774,000 on the resale of the Society Building, a fact which further undermines any argument of inequity in this case.

## F. CONCLUSION

Based upon this court's reasoning and the statutes and cases cited, the Bankruptcy

Court's decision is **AFFIRMED. IT IS SO ORDERED.**